IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

GENOVA TECHNOLOGIES,

Plaintiff,

vs.

THE SIGNATURE GROUP,

Defendant.

No. C08-0133

REPORT AND RECOMMENDATION

———————————

## TABLE OF CONTENTS

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.  The Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.  The Centers for Medicare & Medicaid Services. . . . . . . . . . . . . 3
     C.  Prior Work for CMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     D.  The Dispute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
     A.  The Threat of Irreparable Harm to Genova. . . . . . . . . . . . . . . 8
     B.  The Balance Between the Harm to Genova and the
         Injury that Granting an Injunction Will Inflict on Signature. . . . . 11
     C.  The Probability that Genova Will Succeed on the Merits. . . . . . . 12
         1.  Breach of Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . 12
         2.  Tortious Interference with Business Relations. . . . . . . . . 18
     D.  The Public Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.   SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI.  RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## I. INTRODUCTION

On the 16th day of April 2009, this matter came on for hearing on Plaintiff's request for a preliminary injunction, as contained in its Complaint filed on October 24, 2008. The plaintiff, Genova Technologies, was represented by its attorney, Nancy A. Wood. The defendant, The Signature Group, was represented by its attorneys, Brian J. Fagan and Larry D. Gutz. At their request, both parties were given until April 30 to file post-hearing briefs and argument.

## II. PROCEDURAL HISTORY

On October 24, 2008, Plaintiff Genova Technologies ("Genova") filed a Complaint (docket number 2) alleging breach of contract (Count I) and tortious interference with business relations (Count II). In addition, Genova sought injunctive relief (Count III). Defendant The Signature Group ("Signature") filed an Answer (docket number 7) on December 8, 2008, denying the material allegations.

On February 13, 2009, the Court adopted a proposed scheduling order and discovery plan submitted by the parties. Among other things, the Court established an October 30, 2009 deadline for completion of discovery and a trial ready date of February 15, 2010. On April 1, 2009, Judge Edward J. McManus referred this case to the undersigned Magistrate Judge for a report and recommendation regarding Genova's request for injunctive relief. *See* Order (docket number 12).

## III. RELEVANT FACTS

### A. The Parties

Genova Technologies is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. The record is silent regarding its history, the number of persons which it employs, or the nature and scope of its activities. At the time of hearing, however, James Poland testified that he has been employed by Genova as a program manager for the past 13 years. According to Poland (who lives and works in Maryland), Genova "is involved with complete life cycle development of information technology

2

systems from requirements development through coding, testing, and implementation of software and computer systems."[1]

For the past five years, Genova has been performing work for the Centers for Medicare & Medicaid Services, an agency within the Department of Health and Human Services. In performing that work, Genova subcontracts with various consultants. Poland testified that Genova currently has eight subcontractors working for some component of the Centers for Medicare & Medicaid Services. Signature is one of those subcontractors.

Corey Cook testified that he is the "owner" of The Signature Group. The company has been in existence for about three years. Cook and his wife are its only employees, although Signature also occasionally employs consultants as subcontractors.

## B. The Centers for Medicare & Medicaid Services

A resolution of the parties' dispute requires an understanding of the Centers for Medicare & Medicaid Services ("CMS"). According to its website, the Department of Health and Human Services ("HHS") is the United States government's "principal agency for protecting the health of all Americans and providing essential human services."[2] The work of HHS is conducted by the Office of the Secretary and 11 agencies, including the Centers for Medicare & Medicaid Services ("CMS"). The CMS has its headquarters in Baltimore, Maryland.

The CMS is, in turn, comprised of various components. An organizational chart, introduced at the hearing as Plaintiff's Exhibit 1, shows at least 17 various "offices" or "centers" within the CMS. According to Poland, Genova has performed work for eight of those business components, including the Center for Drug and Health Plan Choice, the Center for Medicare Management, the Center for Medicaid and State Operations, the Office of Clinical Standards and Quality, the Office of Research, Development, and

---

[1] *See* Transcript of Preliminary Injunction Hearing, 5:23-6:1 (docket number 22-3).

[2] *See* http://www.hhs.gov/about/.

Information, the Office of Information Services, the Office of Financial Management, and the Office of the Actuary.

Of particular interest to the instant action is the Center for Drug and Health Plan Choice ("CPC") and the Office of Research, Development, and Information ("ORDI"). As set forth in more detail below, both parties have previously performed work for the CPC. The dispute between the parties involves work which Signature is currently performing for the ORDI.

### C. Prior Work for CMS

Corey Cook, owner of The Signature Group, testified that for the last five years he has worked in different business areas within the CMS. Initially, Cook contracted with a company called MiterTech to perform work for the Office of Information Services ("OIS"). After that, Cook contracted with a company called LMI to do consulting work for the Center for Beneficiary Choices ("CBC").[3] A copy of Signature's contract with LMI, dated October 1, 2006, was introduced at the hearing as Defendant's Exhibit A. While working for MiterTech and LMI, Cook had a "cubical" or office at the CMS headquarters in Baltimore.

Genova and Signature first began working together in October 2006. According to Poland, one of the principals in the Office of Information Services ("OIS") recommended Cook for a project which Genova had coming up. Genova and Signature subsequently entered into a Consulting Services Agreement (Plaintiff's Exhibit 3) which provided that Signature would perform certain consulting services to "facilitate joint application design services." It would appear from the Agreement that the work was to be performed for the

---

[3] During a recent reorganization, the Center for Beneficiary Choices ("CBC") was renamed the Center for Drug and Health Plan Choice ("CPC"). In the Consulting Services Agreement entered into between the parties (Plaintiff's Exhibit 2), the parties refer to the Center for Beneficiary Choices. It is the same business component, however, as the Center for Drug and Health Plan Choice found on the CMS Organizational Chart (Plaintiff's Exhibit 1).

Office of Information Services ("OIS"), but Poland testified that the work was for the Center for Beneficiary Choices ("CBC").

In July 2007, the parties entered into a second Consulting Services Agreement (Plaintiff's Exhibit 2), which is the subject of this litigation. Under the second agreement, Signature was to provide consulting services for work to be performed for the Center for Beneficiary Choices ("CBC"). Signature had already provided consulting services for the CBC while it was contracted to LMI. Since Signature had previously done work for the CBC, the parties agreed to an amendment to the non-solicitation clause in Genova's standard Consulting Services Agreement. In relevant part, the agreement signed by the parties states:

> 6.2 **Non-Solicitation of Clients.** During the term of this Agreement and for a period of twelve (12) months after its termination, Consultant will not solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any client or prospective client of the Genova. The phrase "client or prospective client" means any entity (e.g., individual, business, business unit, or business division) for whom Consultant will provide Services under this Agreement or that Consultant has made contact with as a result of this Agreement.
>
> **Amendment to 6.2:** It is the understanding of both parties, Genova and the Consultant that there is currently a relationship in place between the Consultant and the Client for whom the Consultant will provide Services under this agreement. This client "Center for Beneficiary Choices" is excluded from the terms in article 6.2 for the services that will be provided by the Consultant as specifically defined in CMS Task Order 15.

*See* Genova Technologies Consulting Services Agreement (Plaintiff's Exhibit 2) at 6.

It is undisputed that Signature is not prohibited by the Agreement from seeking or separately contracting for work with the Center for Beneficiary Choices ("CBC").[4] The parties dispute, however, whether Signature may solicit and contract for work from other business components within the Centers for Medicare & Medicaid Services ("CMS").[5]

### D. The Dispute

In June 2008, James Poland of Genova was provided with a "Statement of Work" (Plaintiff's Exhibit 5) regarding a new project to be undertaken by the Centers for Medicare & Medicaid Services ("CMS"). The Secretary of HHS directed the CMS "to develop a new demonstration initiative using Medicare waiver authority to reward the delivery of high-quality care supported by the adoption and use of electronic health records." According to Poland, they wanted Genova to provide certain services regarding "the identity and access management portion" of the project. Poland inquired regarding whether there was an opportunity for Genova to pursue the balance of the project. The Statement of Work required the contractor to provide project management, documentation of requirements, and quality assurance and testing. Genova had experience in all of those areas. When he subsequently discussed the matter with an official involved in the project, however, Poland was told that "they believed they already had selected a vendor to do that."

Corey Cook of Signature testified that he was approached regarding the project by two directors in the Office of Research, Development, and Information ("ORDI"). Both men had formerly worked in the Office of Information Services ("OIS") and Cook had

---

[4] Generally, in order to do work for the government, a business must be issued a "contracting vehicle." Until recently, Signature apparently lacked the capacity to contract directly with the government. In the spring of 2008, however, Signature obtained its own contracting vehicle.

[5] The parties' July 9, 2007 Agreement (Plaintiff's Exhibit 2) was extended by an additional Statement of Work entered into between the parties on August 15, 2008 (Plaintiff's Exhibit 4).

worked with them when he was consulting under contract with MiterTech. On August 14, 2008, Charles Littleton, a contract specialist with the Centers for Medicare & Medicaid Services ("CMS"), sent a letter (Plaintiff's Exhibit 7) to Signature, inviting it to submit a proposal to develop a demonstration project relating to the use of electronic health records. The scope and requirements of the work to be performed were set forth in a Statement of Work (Plaintiff's Exhibit 6) dated August 12, 2008.[6] On September 25, 2008, Signature was awarded a contract (Plaintiff's Exhibit 8) for the work, in the amount of $700,000.

The work to be performed pursuant to the contract is under the auspices of the Office of Research, Development, and Information ("ORDI"), one of the business components within the CMS. Genova asserts that pursuant to the parties' agreement, Signature is prohibited from contracting with any of the CMS business components, other than the Center for Beneficiary Choices ("CBC"). Signature argues that the non-solicitation clause in the Agreement, as amended, does not prevent it from contracting with the various CMS business components.

Additional relevant facts will be set forth below.

## IV. DISCUSSION

Genova claims that the non-solicitation clause found in the parties' July 2007 Agreement prohibits Signature from soliciting or contracting for any work with business components within the Centers for Medicare & Medicaid Services ("CMS"), except for the Center for Beneficiary Choices ("CBC"). In September 2008, Signature contracted to do work for the Office of Research, Development, and Information ("ORDI"), one of the business components within the CMS. In Counts I and II of its Complaint, Genova seeks monetary damages for Signature's alleged breach of contract and tortious

---

[6] The Statement of Work (Plaintiff's Exhibit 6) provided to Signature was an "updated" version of the Statement of Work (Plaintiff's Exhibit 5) previously provided to Genova.

interference with business relations. In Count III, Genova asks that Signature be enjoined "from further breaches of its obligation to Genova under the Agreement." It is Genova's request for injunctive relief that is presently before the Court.

In determining whether a preliminary injunction should issue under FEDERAL RULE OF CIVIL PROCEDURE 65, the Court is guided by the familiar principles found in *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981).

> [W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Id.* at 114. "In balancing the equities no single factor is determinative." *Id.* at 113. Genova has the burden of proving that the issuance of a preliminary injunction is appropriate. *Baker Elec. Co-op., Inc. v. City of Minneapolis*, 28 F.3d 1466, 1472 (8th Cir. 1994). The Court will consider each of the *Dataphase* factors in turn.

### A. The Threat of Irreparable Harm to Genova

The first *Dataphase* factor is whether irreparable harm will be caused to the movant if a preliminary injunction is not issued. *Dataphase*, 640 F.2d at 114. While the *Dataphase* Court suggested that "no single factor is determinative," it also indicated that a preliminary injunction should not issue if the movant will not suffer irreparable harm. *Id.* at 114, n.9 ("This Court previously noted that under any test the movant is required to show the threat of irreparable harm. (citations omitted) Thus, the absence of a finding of irreparable harm is alone sufficient ground for vacating the preliminary injunction."). The "threshold inquiry" is whether the movant has shown the threat of irreparable injury. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991). *See also Baker Elec.*, 28 F.3d at 1472 ("[A] party moving for a preliminary injunction is required to show the threat of irreparable harm."); *Modern Computer Systems, Inc. v. Modern Banking Systems, Inc.*, 871 F.2d 734, 738 (8th Cir. 1989) (same).

8

Signature argues that Genova will not suffer irreparable harm if a preliminary injunction is not issued, since Genova will still be able to pursue its claim for monetary damages. *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 967 (8th Cir. 2005) ("It is well-established that a party is entitled to equitable relief only if there is no adequate remedy at law.") (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)). Genova argues that by its very nature, a breach of a covenant not to compete necessarily causes irreparable harm, citing *Moore Business Forms, Inc. v. Wilson*, 953 F. Supp. 1056 (N.D. Iowa 1996).

The work being performed by Signature under the July 2007 Agreement, as extended by the parties in August 2008 (*See* Plaintiff's Exhibits 2 and 4), is ongoing. Under its terms, the non-solicitation clause extends "[d]uring the term of this Agreement and for a period of twelve (12) months after its termination." Accordingly, if the Agreement prevents Signature from contracting with the CMS business components other than the CBC, then the prohibition is ongoing. Cook denied that Signature is actively seeking more work within the CMS, testifying that Signature "is a company and we are trying to get more business when we need to get more business," although "[a]t this time we do not need to get more business."[7]

Generally, when a movant has an adequate remedy at law - *i.e.*, the availability of monetary damages - then a Preliminary injunction will not issue. *See Frank B. Hall & Co. v. Alexander & Alexander*, 974 F.2d 1020, 1025 (8th Cir. 1992). Here, Signature argues that *if* it wrongfully contracted with the ORDI, or wrongfully contracts with other CMS business components in the future, then Genova may sue for monetary damages. This argument ignores, however, "less tangible injuries" associated with the breach of a non-compete clause, such as loss of good will and business relationships. In some cases, the availability of monetary damages will not preclude the issuance of a temporary injunction.

---

[7] *See* Transcript of Preliminary Injunction Hearing, 72:24-73:1 (docket number 22 at 19-20).

*Branstad v. Glickman*, 118 F. Supp. 2d 925, 942 (N.D. Iowa 2000) ("Even where money damages are available to compensate for some of the harm to the movant, other less tangible injuries cannot be so easily valued or compensated, so that the availability of money damages that do not fully compensate the movant do not preclude a preliminary injunction.").

Irreparable harm may be established even if a valid damages claim may be available.

> Irreparable harm may be established through a showing that the moving party does not have an adequate remedy available at law. Conversely, proof of the existence of an adequate legal remedy supports an inference of the absence of irreparable harm. **The mere availability of a valid damages claim, however, does not preclude the issuance of a preliminary injunction because money damages may not fully compensate a movant's less tangible injuries.**

*Moore Business Forms, Inc. v. Wilson*, 953 F. Supp. 1056, 1062 (N.D. Iowa 1996) (internal citations omitted) (emphasis added). Injury to good will or damage to business relationships may constitute "the sort of intangible injuries which may be found to be irreparable harm for the purpose of weighing the propriety of an injunction." *Id.*

If the non-solicitation clause in the parties' agreement is valid, and if Signature wrongfully violates the agreement by soliciting and contracting with other CMS business components, then Genova's relationships with those business components would be harmed. In *Wachovia Securities, LLC v. Stanton*, 571 F. Supp. 2d 1014, 1046 (N.D. Iowa 2008), the Court found that the "mere violation" of a non-solicitation covenant "suffices to show irreparable harm" to justify issuance of a preliminary injunction. *See also N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) (noting that the lack of a preliminary injunction would leave the plaintiff with the "Hobson's choice" of either filing a separate lawsuit for damages each time the defendant violated the non-solicitation clause, "or waiting until [its] customers and good will had been completely drained away").

The Court concludes that if the non-solicitation clause in the parties' agreement prohibits Signature from soliciting or contracting with the CMS business components other than the CBC, then Genova does not have an adequate legal remedy at law for further breach by Signature. That is, Genova's good will and relationships with the CMS business components would be harmed by repeated violations of the non-solicitation clause. Merely bringing an action for monetary damages following each breach does not provide Genova with an adequate legal remedy.

## B. *The Balance Between the Harm to Genova and the Injury that Granting an Injunction Will Inflict on Signature*

The second *Dataphase* factor requires a balancing between the harm to the movant if a preliminary injunction is not issued, and the injury that granting a preliminary injunction will inflict on the non-movant. *Dataphase*, 640 F.2d at 114. "[T]he balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1436 (N.D. Iowa 1996).

If a preliminary injunction is not issued, then Genova will be required to compete with Signature for contracts with the various CMS business components, potentially losing profits on those contracts. If a preliminary injunction is issued, then Signature is prohibited from soliciting or contracting with the CMS business components other than the CBC, potentially losing profits from those contracts. Accordingly, it would appear that the harm to Genova by wrongfully failing to grant a preliminary injunction is identical to the harm to Signature by wrongfully granting a preliminary injunction.

While the record is somewhat imprecise, it would appear that all of Signature's work is done with the Centers for Medicare & Medicaid Services ("CMS") and its business components. The record is silent regarding what percentage of Genova's business is with the CMS and its various components. Accordingly, it would appear that the relative harm of lost profits would fall more heavily on Signature.

### C. The Probability that Genova Will Succeed on the Merits

The third *Dataphase* factor which must be considered in determining whether a preliminary injunction should issue is the probability that the movant will succeed on the merits. *Dataphase*, 640 F.2d at 114. In determining the "probability of success," it is not necessary that the movant prove a greater than 50% likelihood that it will prevail on the merits, if the balance of the other three factors strongly favor the moving party. *Id.* at 113. However, if a balancing of harms to the parties weighs in favor of the non-movant, then the moving party faces a "heavy burden" of showing that it will likely prevail on the merits.

> If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less.

*Id.* Here, Genova claims entitlement to recover for breach of contract (Count I) and tortious interference with business relations (Count II). The Court will review the "probability of success" on each of Genova's claims.

### 1. Breach of Contract

In Count I of its Complaint, Genova claims that the non-solicitation clause in the parties' agreement prohibits Signature from soliciting or contracting with the Centers for Medicare & Medicaid Services ("CMS") business components, other than the Center for Beneficiary Choices ("CBC"). Specifically, Genova claims that Signature's contract with the Office of Research, Development, and Information ("ORDI") to develop a demonstration project for electronic health records is a violation of the non-solicitation provision.

The parties' agreement provides that it "shall be governed by and construed in accordance with the laws of the State of Iowa."[8] To prevail on its claim for breach of contract, Genova must prove:

(1)     the existence of a contract;

(2)     the terms and conditions of the contract;

(3)     that [it] has performed all the terms and conditions required under the contract;

(4)     the defendant's breach of the contract in some particular way; and

(5)     that plaintiff has suffered damages as a result of the breach.

*Kern v. Palmer College of Chiropractic*, 757 N.W.2d 651, 657-58 (Iowa 2008). Here, the existence of the contract is undisputed. In addition, Signature does not claim that Genova has failed to perform any conditions required by it. The parties dispute, however, the terms of the contract, whether Signature has breached the contract, and whether Genova has suffered any damages as a result of the alleged breach.

The primary fighting issue is whether Article 6.2 of the Agreement, as amended, prohibits Signature from contracting with the various CMS business components, other than the CBC. The first sentence in Article 6.2 of Genova's "standard" consulting agreement provides that for the specified period of time, the consultant will not solicit or "take away" the business of "any client or prospective client of the Genova."[9] Thus, the

---

[8] *See* Genova Technologies Consulting Services Agreement (Plaintiff's Exhibit 2), Article 12.1 at 10.

[9] The first sentence states: "During the term of this Agreement and for a period of twelve (12) months after its termination, Consultant will not solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any client or prospective client of the Genova." *See* Genova Technologies Consulting Services Agreement
(continued...)

first sentence of Article 6.2 broadly prohibits Signature from contracting with any of Genova's clients or prospective clients.

The phrase "client or prospective client" is defined in the second sentence of Article 6.2. It includes "any entity" (1) for whom services are provided under the agreement or (2) with whom the consultant has made contact "as a result of this Agreement."[10] The term "entity" is further defined by way of example in a parenthetical as "individual, business, business unit, or business division."

Genova argues that in this case the "entity" is the Centers for Medicare & Medicaid Services ("CMS"). Therefore, according to Genova's argument, Signature is providing services for CMS under the agreement, and is thus prohibited from soliciting additional work from the CMS. Signature argues that the "entity" is the Center for Beneficiary Choices ("CBC"). Accordingly, Signature argues that the services provided by it under the agreement were for the CBC, and the non-solicitation clause does not extend beyond the CBC.

Attached to the parties' agreement as Exhibit A-1 is a Statement of Work, describing generally the work to be performed by Signature pursuant to the agreement. While not a model of clarity, Exhibit A-1 appears to suggest that Genova's "client" is the CBC.

> Vendor shall provide Genova with advice and consulting services ("Services") as defined below, for the benefit of Genova and Genova's client, Centers for Medicare and Medicaid, Center for Beneficiary Choices.

---

[9] (...continued)
(Plaintiff's Exhibit 2) at 6.

[10] The second sentence states: "The phrase 'client or prospective client' means any entity (e.g., individual, business, business unit, or business division) for whom Consultant will provide Services under this Agreement or that Consultant has made contact with as a result of this Agreement." *See* Genova Technologies Consulting Services Agreement (Plaintiff's Exhibit 2) at 6.

*See* Genova Technologies Consulting Services Agreement (Plaintiff's Exhibit 2), Exhibit A-1 at 1. The statement of work provides further detail regarding the services to be performed to "support CBC."[11]

A reading of the contract which limits the term "client" to the CBC, rather than the entire agency (the CMS), would appear to be consistent with the parenthetical descriptions of "client" found in Article 6.2. At the instant hearing, James Poland of Genova testified that the "Centers for Medicare and Medicaid Services are broken into several business components."[12] Similarly, Poland testified:

> A.    Most of the boxes [on the organizational chart] are top level business units -- sometimes call them business components -- for the agency as a whole. There's a few subgroups as well in there.
>
> Q.    When you say sometimes called business components, called business components by whom?
>
> A.    By CMS.

*See* Transcript of Preliminary Injunction Hearing, 12:3-8 (docket number 22 at 4). In giving parenthetical examples of what constitutes a "client" within the meaning of the agreement, Article 6.2 includes a "business unit." Accordingly, the language found in Article 6.2, together with a review of the statement of work attached to the parties' agreement, supports a finding that the "client" referred to in the agreement was the Center for Beneficiary Choices ("CBC"), rather than the Centers for Medicare & Medicaid Services ("CMS").

---

[11] In its opening paragraph, the statement of work refers to Genova as the "company" and Signature as the "consultant." The body of the statement of work refers to the "vendor" and the "contractor." It would appear from the context of the statement of work that these terms also refer to Signature.

[12] *See* Transcript of Preliminary Injunction Hearing, 11:11-12 (docket number 22 at 4).

This interpretation is strengthened by the addition of the "Amendment to 6.2." If left unamended, Article 6.2 of the parties' Agreement would have prohibited Signature from soliciting or separately contracting with the CBC. Recognizing that Signature had a pre-existing relationship with the CBC, the parties agreed to amend Article 6.2. The first sentence of the Amendment states that Signature currently has a relationship with "the Client for whom the Consultant will provide Services under this agreement."[13] Thus, the second sentence of Article 6.2 refers to the client "for whom Consultant will provide services under this Agreement," and the first sentence of the Amendment similarly refers to "the Client for whom the Consultant will provide Services under this agreement."

The second sentence of the Amendment then identifies the "client" as the Center for Beneficiary Choices.[14] Thus, "the Client for whom the Consultant will provide Services under this agreement" is unambiguously identified as the CBC in the Amendment. Nevertheless, Genova would argue that the "client" in Article 6.2 is not the CBC, but rather the CMS. The Amendment to 6.2 clearly identifies the CBC as "the Client for whom the Consultant will provide Services under this agreement." The language employed in the second sentence of Article 6.2 is nearly identical. There is no evidence to support a conclusion that the parties intended the definition of "client" to change from one paragraph to the next.

The non-solicitation clause found in Article 6.2 (*if* unamended) would have prohibited Signature from soliciting or taking away the CBC's business from Genova.

---

[13] The first sentence of the Amendment states: "It is the understanding of both parties, Genova and the Consultant that there is currently a relationship in place between the Consultant and the Client for whom the Consultant will provide Services under this agreement." *See* Genova Technologies Consulting Services Agreement (Plaintiff's Exhibit 2) at 6.

[14] The second sentence of the Amendment states: "This client 'Center for Beneficiary Choices' is excluded from the terms in article 6.2 for the services that will be provided by the Consultant as specifically defined in CMS Task Order 15." *See* Genova Technologies Consulting Services Agreement (Plaintiff's Exhibit 2) at 6.

Recognizing that Signature had a preexisting relationship with the CBC, the parties added an amendment which excluded the CBC from the non-solicitation provisions. The net effect of the amendment was to essentially void the non-solicitation provisions found in Article 6.2. That is, the result is the same as if Article 6.2 had been deleted from the standard agreement altogether.

Genova argues that a "harmonious interpretation" of Article 6.2 and the Amendment requires a finding that the "client" in Article 6.2 is CMS, rather than CBC. The Court believes, however, that such an interpretation results in discordance. The "client" is unequivocally identified in the Amendment as the Center for Beneficiary Choices. An interpretation of Article 6.2 which provides a different definition of "client" is hardly harmonious.

In July 2007, the parties entered into an agreement whereby Signature would provide consulting services to Genova for work to be performed for the CBC. That agreement was extended by an additional statement of work entered into between the parties in August 2008. Also in August 2008, Corey Cook of Signature was approached by two directors in the Office of Research, Development, and Information ("ORDI") regarding a demonstration project for electronic health records. Cook was apparently contacted because he had formerly worked with the directors when they were associated with the Office of Information Services ("OIS") and Cook was working under contract with MiterTech. The work to be performed for the ORDI, a separate business component within the CMS, is unrelated to the work being performed by Signature for the CBC, pursuant to its agreement with Genova.

It should be noted that this is not a case where a former employee takes advantage of contacts which he developed during the course of his employment in order to unfairly trade on his former employer's good will. *See, e.g.*, *Lindsay v. Cottingham & Butler Ins. Services, Inc.*, 763 N.W.2d 568 (Iowa 2009). Corey Cook of Signature testified that he has had an office or cubicle at the CMS headquarters in Baltimore for the last five years,

first working with MiterTech and then with LMI. While working for MiterTech, Cook had contact with two officials at the Office of Information Services ("OIS"), who ultimately approached him to do work for the Office of Research, Development, and Information ("ORDI"). That is, Signature did not obtain the contract with the ORDI as a result of any work performed for Genova with the CBC.

For the reasons set forth above, the Court believes that it is unlikely that Genova will be able to prove that the contract between Signature and the ORDI constitutes a breach of the non-solicitation provision found in the parties' agreement. Accordingly, the Court finds it unlikely that Genova will prevail on its claim for breach of contract (Count I).[15]

### 2. *Tortious Interference with Business Relations*

In Count II of its Complaint, Genova alleges that it "had potential and existing relationships with clients as defined in the Agreement," and that Signature "intentionally interfered with Genova's prospective and existing business opportunities and advantages

---

[15] The Court also notes parenthetically that it is unclear whether Genova would be able to prove damages as a result of the alleged breach. That is, there is no proof that Genova would have received the ORDI contract if it had not gone to Signature. James Poland of Genova testified that if the contract had not been "sole sourced" to Signature, that it would have been submitted to bids and that Genova may have been one of the bidders. According to Poland:

> My understanding, if it's not sole sourced to an 8(a) company, that the small business office would look at their pool of candidates and decide who they believed would be the top three companies that should bid on the project. Genova has a very favorable relationship with the small business office and I have every reason to believe that we would be included in the downsizing selection.

*See* Transcript of Preliminary Injunction Hearing, 34:21-35:3 (docket number 22 at 10). Thus, Genova *may* have been permitted to bid on the ORDI demonstration project and they *may* have been awarded the contract. "A claim for contract damages must fail if the proof of such damages is speculative and uncertain." *Farm Bureau Mut. Ins. Co. v. Osby*, 707 N.W.2d 338 (Table), 2005 WL 2990129 at *4 (Iowa App.).

18

by causing potential and existing customers of Genova to do business with the Defendant."[16]

The elements of the tort of intentional interference with an existing contract are:

    (1)    plaintiff had a contract with a third-party;

    (2)    defendant knew of the contract;

    (3)    defendant intentionally and improperly interfered with the contract;

    (4)    the interference caused the third-party not to perform, or made performance more burdensome or expensive; and

    (5)    damage to the plaintiff resulted.

*Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006).

Genova's complaint is silent regarding the contract with which it claims Signature interfered.[17] That is, there is no evidence in the record that Signature interfered with a contract between Genova and the Centers for Medicare & Medicaid Services ("CMS"), the Office of Research, Development, and Information ("ORDI"), or anyone else. Therefore, the Court fails to see how Genova can recover on a claim of intentional interference with an existing contract.

To the extent Count II of the Complaint alleges a claim of intentional interference with prospective business relations, it also fails. Both theories require proof that Signature intentionally and improperly interfered with the relationship at issue. *Compiano v. Hawkeye Bank & Trust*, 588 N.W.2d 462, 464 (Iowa 1999). That is, the interference must be both intentional and *improper*. "[T]o recover for interference with *prospective* business relations, a plaintiff must prove the defendant acted with the sole or predominate purpose

---

[16] *See* Complaint, ¶¶ 13 and 15 (docket number 2 at 3).

[17] In its Post-Hearing Brief (docket number 24), Genova does not address its claim of tortious interference with business relations.

to injure or financially destroy the plaintiff." *Id.* Even if it can be argued that Signature interfered with prospective contracts between Genova and CMS or its business components, there is no evidence that Signature "acted with the sole or predominate purpose to injure or financially destroy" Genova. Accordingly, the Court finds that it is unlikely that Genova will prevail on its claim of intentional interference with prospective business relations.

### D.  The Public Interest

The final *Dataphase* factor to be considered is how the granting of a preliminary injunction would affect the public interest. *Dataphase*, 640 F.2d at 114. If a preliminary injunction is issued in this case, and Signature is required to discontinue its work on the ORDI demonstration project for electronic health records, then Poland of Genova estimated that the project would be delayed for at least two months. If Signature were permitted to complete its contract with ORDI, but is enjoined from contracting with any other CMS business components, then there is one less contractor bidding on upcoming projects. Presumably, there is a public interest in expanding rather than contracting the number of qualified contractors to bid on public projects.

### V.  SUMMARY

In determining whether a preliminary injunction should issue under FEDERAL RULE OF CIVIL PROCEDURE 65, the Court must consider the four factors set forth in *Dataphase*. Genova has met the threshold requirement of showing that it does not have an adequate remedy at law. For the reasons set forth above, however, I believe that it is unlikely that Genova will prevail on either theory set forth in its complaint. In my view, the agreement entered into between the parties in 2007 does not prevent Signature from soliciting or contracting with any of the CMS business components. Accordingly, I believe that it is unlikely Genova will be able to prevail on its claim that Signature is in breach of its contract by contracting with ORDI on the demonstration project for electronic health records. Furthermore, I believe that Genova will be unable to prove that Signature has

intentionally interfered with one of Genova's contracts, or that Signature has intentionally interfered with Genova's prospective business relationships.

Regarding the other factors set forth in *Dataphase*, the harm to Signature by improperly granting a preliminary injunction would seem to slightly outweigh the harm to Genova by improperly refusing to grant a preliminary injunction. The public interest would seem to weigh against the granting of a preliminary injunction. No single factor is determinative. *Dataphase*, 640 F.2d at 113. After weighing all of the factors, however, I believe that the issuance of a preliminary injunction in this case is not appropriate.

## VI. RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that the District Court *DENY* Genova's request for a preliminary injunction, as contained in its Complaint filed on October 24, 2008.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within ten (10) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the District Court.

DATED this ___4th___ day of May, 2009.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA